# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CELL TOWER LITIGATION | LEAD CASE NO.: 07cv399 BEN (WVG)<br>CONSOLIDATED WITH CASE NO.: 08cv435 BEN (WVG)<br><br>**ORDER**:<br>• **GRANTING IN PART AND DENYING IN PART ATC'S MOTION FOR SUMMARY JUDGMENT**<br>• **GRANTING IN PART AND DENYING IN PART THE CITY'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Dkt. Nos. 233-235, 237, 261-262, 269, 272, 279] |

## INTRODUCTION

Plaintiffs American Tower Corporation and T-Mobile West Corporation (collectively "ATC") and Defendants City of San Diego, City Council of City of San Diego, and Development Services Department of City of San Diego (collectively "the City") have filed cross-motions for summary judgment in Case No. 08cv435 BEN (WVG). (Dkt. Nos. 234, 235.) The parties each seek summary judgment on certain claims concerning the denial of conditional use permits ("CUPs") for wireless communications facilities located at 4350 Otay Mesa Boulevard ("Border site") and 9060 Friars Road ("Mission Valley"). For the reasons discussed below, the Court grants in part and denies in part both motions for summary judgment.

**BACKGROUND**

ATC owns a 90-foot telecommunications tower and associated buildings at the Border site and 180-foot lattice tower and associated buildings at the Mission Valley site. Telecommunications providers, like Plaintiff T-Mobile, use or lease space on the towers to provide wireless services. The previous CUPs for the Border and Mission Valley sites were issued in 1995 and 1996 respectively, for a period of ten years. The CUPs did not provide for extensions or renewal. Rather, both explicitly required the submission of new CUP applications. The Mission Valley CUP specifically required the removal of all antennas and equipment upon expiration, and the Border CUP required all activity cease and that the site be returned to its prior condition upon expiration.

The new CUP applications sought to maintain the sites at existing height and design despite City regulations that require such facilities be designed to be minimally invasive through design, use of architecture, landscape architecture, and siting solutions. Throughout the various stages of the proceedings before the City, ATC refused to make any concessions with regard to the height or design of the towers other than with regard to landscaping and painting, and refused to provide any site-specific analysis of the impact on wireless coverage from lowering the tower or reconfiguring a lower tower in connection with additional lower towers.

Eventually, following a lengthy extension of time by the agreement of the parties, the Hearing Officer denied the applications because the towers failed to comply with the regulations. ATC appealed to the Planning Commission, and the Planning Commission upheld the Hearing Officer's decision.

**DISCUSSION**

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the moving party meets this burden, the burden then shifts to the opposing party to set forth specific facts showing that a genuine issue remains for trial. *Id.* "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole,

which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting FED. R. OF CIV. P. 1)).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. Evidence raises a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 252. "[W]hen parties submit cross motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'justifiable inference' is not necessarily the most likely inference or the most persuasive inference. Rather, 'an inference as to another material fact may be drawn in favor of the nonmoving party . . . if it is rational or reasonable.'" *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (quoting *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987)).

**I.  Telecommunication Act ("TCA") — 47 U.S.C. § 332**

ATC moves for summary judgment on its four claims under 47 U.S.C. § 332(c)(7): unreasonable discrimination, effective prohibition, unreasonable delay, and lack of substantial evidence.[1] The City moves for summary judgment on ATC's claims for unreasonable discrimination,

---

[1] (A) General authority
Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
(B) Limitations
(i) The regulation of the placement, construction, and modification of personal wireless

effective prohibition, and substantial evidence. The Telecommunications Act affirms local government zoning authority "regarding placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). But that authority is limited. § 332(c)(7)(B). Specifically, local governments: "shall not unreasonably discriminate among providers of functionally equivalent services," § 332(c)(7)(B)(i)(I); "shall not prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II); "shall act . . . within a reasonable period of time," § 332(c)(7)(B)(ii); and any decision by a local government to deny a request for a personal wireless service facility must be supported by substantial evidence, § 332(c)(7)(B)(iii).

### A.     Substantial Evidence[2]

"[T]he substantial evidence inquiry does not require incorporation of the substantive federal standards imposed by the TCA, but instead requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law.*" *MetroPCS, Inc. v. City & Cnty. of S.F.*, 400 F.3d 715, 723–24 (9th Cir. 2005) (emphasis in original). The substantial evidence review is "deferential." *Id.* at 725. The Court may not "engage in [its] own fact-finding nor supplant the [City's] reasonable determinations." *Id.* "The upshot is simple: this Court may not overturn the [City's] decision on 'substantial evidence' grounds if that decision is authorized and supported by a reasonable amount of evidence (i.e., more than a 'scintilla' but not necessarily a preponderance)." *Id.*; *see also Sprint PCS Assets, LLC v. City of Palos Verdes Estates*,

---

service facilities by any State or local government or instrumentality thereof—
  (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
  (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.
(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.
47 U.S.C. § 332(c)(7)

[2]The Court considers ATC's substantial evidence claim first because, if a city's "decision fails that test it, of course, is invalid even before the application of the TCA's federal standards." *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 993 (9th Cir. 2009).

1  583 F.3d 716, 721 (9th Cir. 2009).

2  San Diego Municipal Code § 141.0405 regulates communications towers like the Border and Mission Valley sites. Additionally, for sites located within a residential area, like the Border site, City of San Diego zoning code RS-1-7 also applies. The City appropriately considered the 90 and 180-foot towers and equipment buildings major communications facilities and evaluated the CUPs under those requirements. In addition to other requirements, "[m]ajor telecommunications facilities shall be designed to be minimally visible through the use of architecture, landscape architecture, and siting solutions, . . . us[ing] the smallest and least visually intrusive antennas and components that meet the requirements of the facility." S.D.M.C. § 141.0405. Accordingly, the regulations authorize the City to consider the visual impact of the tower, including whether the applicant has used design, architecture, and landscape architecture to minimize its visibility.

More than a scintilla of evidence supports the City's denial of the CUPs. As to the Mission Valley site, the City found that the 180-foot tower was a visual blight in the neighborhood, visible from I-8, I-805, Friars Road, and canyon rim homes above the valley. Additionally, the City found that the lattice tower was particularly obstructive because of extra materials, brackets, and cables affixed to the lattice. As to the Border site, the City found that the tower had a significant visual impact from the north and south I-805 and on the surrounding residential area, and noted the significant difference between the Border site and the other nearby towers that were much lower and camouflaged to minimize visibility.

The regulations authorize the City's consideration of these factors in denial because the City is charged with requiring designs that are minimally visible. Reviewing the record deferentially, as the Court must, the Court finds that the City's decision was supported by more than a scintilla of evidence. Accordingly, the Court grants summary judgment in favor of the City on this claim.

### B.   Unreasonable Delay

ATC argues that the City did not act on ATC's applications within a reasonable time, in violation of § 332(c)(7)(B)(ii). Section 332(c)(7)(B)(ii) requires local governments to "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time . . ."

Without citation to authority, ATC asserts that the City's delay was per se unreasonable because it violated the Permit Streamlining Act ("PSA"). The Court disagrees. Unlike the PSA, which imposes an unwaivable deadline subject only to a possible 90-day extension, the breach of which may result in the approval of the application, § 332(c)(7)(B)(ii) only requires local governments to act within a reasonable time and does not preclude lengthy extensions of time. Given the parties' mutual agreement to extend the time for the City to act on ATC's applications, the applications were acted on within a reasonable period of time. Accordingly, because ATC cannot succeed on its unreasonable delay claim, ATC is not entitled to summary judgment on this claim.

### C.    Unreasonable Discrimination

ATC argues that the City's denials of its applications for the Border and Mission Valley sites constitute unreasonable discrimination. The TCA prohibits "regulation of the placement, construction, and modification of personal wireless service facilities . . . [that] unreasonably discriminate[s] among providers of functionally equivalent services." § 332(c)(7)(B)(i)(I). ATC claims that the City is treating itself differently and has approved permits for similar CUPs. To succeed on its unreasonable discrimination claim, ATC must prove that ATC and the City or other CUP applicants are providers of functionally equivalent services and that the City is unreasonably discriminating between the City or other applicants and ATC. *Id.*

The parties do not dispute that the City has two towers that are somewhat comparable to the Border and Mission Valley sites in terms of size and that the City does not impose its regulations on its own towers. ATC argues that the City's imposition of regulations on ATC that it does not impose upon itself gives the City an unfair competitive advantage against ATC, and that the City's use of its towers, *i.e.*, the services provided on the towers, are comparable. The City counters that it does not market or advertise its towers in competition with ATC, primarily uses its towers for emergency communications and the general business of the City, and is lawfully exempt from its own land use regulations.

///

///

///

ATC and the City are not providers of functionally equivalent services. While the evidence presented by the parties does not provide the most comparable information for scrutiny, it is clear that the City's towers are used primarily for City services, including emergency services. Its minimal leases to other providers, predominately public entities, on these two towers are not comparable to ATC's tower being used entirely for commercial gain with substantially greater revenue, even if some of that commercial use includes emergency services. As the Court noted in its August 5, 2011 Order, in reaching this conclusion, the Court is mindful that the City's use of its towers could certainly reach a point where it is more equivalent to ATC, and ATC's concerns that the City is tipping the scales in its favor as a direct competitor might have more traction. Based on the evidence provided, however, ATC and the City are not providers of functionally equivalent services.

ATC additionally argues that the City's approval of co-locations for wireless providers on existing towers years before ATC's CUPs were denied and approval of a CUP for an 80-foot tower ten years before the City's denial of ATC's CUPs constitutes unreasonable discrimination. But, § 332(c)(7)(B)(i)(I) "explicitly contemplates that some discrimination 'among providers of functionally equivalent services' is allowed. Any discrimination need only be reasonable." *MetroPCS*, 400 F.3d at 727(summarizing cases). Additionally, "discrimination based on 'traditional bases of zoning regulation' such as 'preserving the character of the neighborhood and avoiding aesthetic blight' are thus permissible." *Id.* (quoting *AT&T Wireless, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 427 (4th Cir. 1998)). Considering the significant differences between the approval sought and the intervening years, any discrimination was reasonable. Accordingly, the City is entitled to summary judgment on ATC's unreasonable discrimination claim under § 332(c)(7)(B)(i)(I).[3]

**D.  Effective Prohibition**

ATC argues that the City's denials of its applications for CUPs for the Border and Mission Valley sites constitute effective prohibition. Under the TCA, local government's regulation of personal wireless facilities cannot "prohibit or have the effect of prohibiting the provision of personal wireless services." § 332(c)(7)(B)(i)(II). "[A] locality can run afoul of the TCA's 'effective

---

[3] The City additionally argues that ATC cannot succeed on this claim because it is not a service provider. However, the Court need not reach this issue.

prohibition' clause if it prevents a wireless provider from closing a 'significant gap' in service coverage." *MetroPCS*, 400 F.3d at 731. To succeed on this claim, ATC must demonstrate a significant gap in service and that the way "it proposes to fill the significant gap in services is *the least intrusive on the values that the denial sought to serve*." *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 995 (9th Cir. 2009) (emphasis in original) (quoting *MetroPCS*, 400 F.3d at 734).

Because the Court finds that ATC did not demonstrate that its proposal was the least intrusive means of filling a significant gap in service, assuming there even was a significant gap in service,[4] ATC's effective prohibition claim cannot succeed. It is ATC's burden to show that its proposal — the existing towers without any reduction in height or alteration in design other than additional trees and painting — was the least intrusive means of closing a significant gap in coverage. *MetroPCS*, 400 F.3d at 734. This means that ATC "has the burden of showing the lack of available and technologically feasible alternatives." *T-Mobile*, 572 F.3d at 996 (citing *SprintTelephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 (9th Cir. 2008) (en banc) ("*Sprint II*")). This standard is intended to "allow for meaningful comparison of alternative sites before the siting application process is needlessly repeated. It also gives the providers an incentive to choose the least intrusive site in their first siting applications, and it promises to ultimately identify the best solution for the community, not merely the last one remaining after a series of application denials." *Id.* at 995 (emphasis added).

Much like the Versus site previously addressed by the Court, it is clear from the record in this case that ATC refused to make any concession with regard to the design or height of its towers and made only minor concessions with regard to landscaping. Throughout the proceedings, despite repeated requests from the City for alternatives and information about coverage gaps with regard to the specific sites, ATC refused to provide any re-design or re-configuration options, any analysis of service gaps specific to either site, or any alternatives to the existing tower. ATC essentially told the

---

[4]The Court notes that the significant gap analysis is particularly challenging in this case because what exactly constitutes a significant coverage gap for a tower manager, like ATC, rather than a wireless services provider, like those that lease space from ATC, is not clear in the case law. The significant gap analysis considers whether "a provider is prevented from filling a significant gap in its *own* service coverage." *MetroPCS*, 400 F.3d at 733 (emphasis in original). Additionally, the "significant gap determination [is an] extremely fact-specific inquir[y] that def[ies] any bright-line legal rule." *Id.*

1  City that keeping its towers exactly the same, without any alteration to height or design to bring it into
2  greater compliance with the City's regulations, was the best option, without offering any substantive
3  analysis of alternatives. If ATC had offered some substantive analysis with regard to the specific sites
4  or any analysis of alternatives during the administrative proceedings, the City might have been able
5  to determine that ATC's proposals were the least intrusive options.

6  The facts of this case are drastically different from those of *T-Mobile, USA, Inc. v. City of
7  Anacortes*, where a provider submitted analysis of eighteen alternative sites. 572 F.3d at 995. Here,
8  ATC did not show "a good faith effort [had] been made to identify and evaluate less intrusive
9  alternatives, *e.g.*, that the provider has considered . . . alternative system designs, alternative tower
10 designs, placement of antennae on existing structures, etc." *Id.* at 996 n.10 (quoting with approval
11 *APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler Cnty.*, 196 F.3d 469, 480 (3d Cir. 1999)). ATC did
12 not offer any analysis of any alternatives. ATC has failed to meet its burden to show that its proposals
13 to the City were the least intrusive means of filling a significant coverage gap, assuming there was a
14 coverage gap. Accordingly, the City is entitled to summary judgment on ATC's effective prohibition
15 claim.

16 **II.     Dormant Commerce Clause**

17 ATC and the City move for summary judgment on ATC's dormant commerce clause claim.
18 "The negative or dormant implication of the Commerce Clause prohibits state . . . regulation . . . that
19 discriminates against or unduly burdens interstate commerce and thereby impedes free private trade
20 in the national marketplace." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997). In determining
21 whether the dormant commerce clause has been violated, the Court must apply a two-tiered approach.
22 *S.D. Meyers, Inc. v. City & Cnty. of S.F.*, 253 F.3d 461, 466 (9th Cir. 2001). First, the Court
23 considers whether the regulation directly discriminates against interstate commerce. *Id.* If it does, it
24 will generally be struck down. *Id.* Second, if the regulation only indirectly affects interstate commerce
25 and regulates evenhandedly, the Court must determine whether the regulation imposes a burden "that
26 is clearly excessive in relation to the putative local benefits." *C&A Carbone, Inc. v. Clarkstown*, 511
27 U.S. 383, 390 (1994); *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).
28 ///

ATC agrees that the first tier does not apply to this case. However, ATC argues that the regulations are excessive in relation to the local benefits because the City imposes the regulations on ATC's towers, but does not impose the regulations upon its own towers. Essentially, ATC's claim is based on the City's exemption of the City from zoning regulations. ATC cites no cases where the dormant commerce clause has been extended to a similar situation and as previously discussed, ATC and the City are not similar, making comparison for purposes of the Commerce Clause unwise. *See Gen. Motors Corp.*, 519 U.S. at 298 ("Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities.").

While the Court is mindful of ATC's speculation that the City could, theoretically, directly compete in the wireless market and regulate the market to the City's benefit, there is no basis in the evidence for that speculation and the regulations do not require that result. The City is imposing zoning regulations on all wireless providers that require minimizing the intrusiveness of wireless sites. It simply requires providers to submit proposals that are minimally intrusive on the community. Such an even-handed regulation will not violate the commerce clause unless its burdens "so outweigh the putative benefits as to make the statute *unreasonable or irrational*." *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (1991) (emphasis added). ATC has not established that the regulations themselves are unreasonable or irrational or even that the City's exemption of itself, a markedly different entity, from those regulations is unreasonable or irrational. Accordingly, the City is entitled to summary judgment on ATC's dormant commerce clause claim.

**III.   Equal Protection Claim**

ATC moves for summary judgment on its Equal Protection claim. ATC argues that the City violated the Equal Protection Clause by imposing its land use regulations on ATC without imposing the regulations on the City's two towers.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Additionally, municipal decisions, like those at issue here, "are presumptively constitutional and, therefore, need only be rationally related to a legitimate state interest, unless the distinctive treatment of the party involves either a fundamental right or a suspect classification." *Del Monte Dunes at Monterey, Ltd.*

*v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990).

As previously discussed, ATC and the City are not similarly situated entities. The City's two towers are used primarily for City services with minimal leases, primarily to other public entities, while ATC's towers are used entirely for commercial gain with substantially greater revenue. Additionally, the City is enforcing facially neutral regulations that are rationally related to the government's interest in minimizing, to the extent possible, the intrusion of wireless facilities on the community.

ATC cannot succeed on its Equal Protection claim because ATC and the City are not similarly situated and the City's regulations are rationally related to a legitimate government interest. Accordingly, ATC is not entitled to summary judgment on this claim.

## IV.  Fundamental Vested Right (California Code of Civil Procedure § 1094.5)

ATC and the City move for summary judgment on ATC's fundamental vested rights claim under California Code of Civil Procedure § 1094.5. ATC claims it has a fundamental vested right to the continued use of its Border and Mission Valley sites without alteration, despite explicit expiration dates in the CUPs.

"The grant or denial of a conditional use permit is an administrative or quasi-judicial act. Judicial review must be in accordance with [California] Code of Civil Procedure 1094.5." *Goat Hill Tavern v. City of Costa Mesa*, 6 Cal. App. 4th 1519, 1525 (4th Dist. 1992) (internal citation omitted). "If an administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence." *Id.* "If the decision does not substantially affect a fundamental vested right, the trial court considers only whether the findings are supported by substantial evidence in light of the whole record." *Id.*

The Court determines if a decision impacts a fundamental vested right on a case-by-case basis, with courts giving less weight to "preservation of purely economic interests." *Id.* at 1526. "The courts have rarely upheld the application of the independent judgment test [*i.e.* a fundamental vested right, with regard] to land use decisions." *Id.* at 1527.

///

ATC does not have a fundamental vested right to continued use of the Border and Mission Valley sites without alteration because the CUPs approving the sites contained explicit expiration dates and the denials of the new permits implicate purely economic interests.

ATC cites only one case, *Goat Hill Tavern v. City of Costa Mesa*, in which a California court has found a fundamental vested right despite an expiration date in a CUP. *Goat Hill Tavern*, 6 Cal App. 4th at 1529. However, the facts of that case were very unique, as the court itself acknowledged. *Id.* (affirming lower court on the "unique facts" of the case). *Goat Hill Tavern* involved a CUP issued to a 35-year business. *Id.* The CUP was only necessary to accommodate an expansion, but it expired just six months later. *Id.* The permit was issued with the understanding that it would be renewed. *Id.* at 1529; *Metro. Outdoor Adver. Corp. v. City of Santa Ana*, 23 Cal. App. 4th 1401, 1404 (4th Dist. 1994). The Court even noted that is was "utterly implausible that Ziermer knowingly gave up all rights to continue operating Goat Hill Tavern in exchange for the opportunity to keep his game room expansion open for six months." *Goat Hill Tavern*, 6 Cal App. 4th at 1529 n.4.

In sharp contrast, ATC's predecessor[5] obtained 10-year CUPs for each site. The Border CUP explicitly required ceasing all activity at the site and returning the site to its original condition ten years after the permit was issued if a new permit application was not timely submitted 90 days prior to expiration and ultimately approved. The Mission Valley CUP states that the CUP is null and void upon expiration absent approval of a new CUP and requires all antennas and equipment be removed upon expiration.

These facts are more akin to the numerous cases distinguished in *Goat Hill Tavern* involving purely economic interests. *Id.* at 1527–29; *San Marcos Mobilehome Park Owners' Ass'n v. City of San Marcos*, 192 Cal. App. 3d 1492 (4th Dist. 1987) (denying rent increase in rent-controlled building); *Mobile Oil Corp. v. Superior Court*, 59 Cal. App. 3d 293 (4th Dist. 1976) (requiring installation of vapor recovery systems at gas stations); *Standard Oil v. Feldstein*, 105 Cal. App. 3d 590 (1st Dist. 1980) (forcing shut down of new refinery as required by explicit language of permit). As with each of these cases, ATC might incur some expense or loss of business if it reduced its tower or

---

[5]ATC does not dispute that the CUPs run with the land regardless of a change in ownership.

redesigned it to achieve greater compliance with the City regulations, but this loss is purely economic.

The most factually analogous case is *Metropolitan Outdoor Advertising Corp. v. City of Santa Ana*, 23 Cal. App. 4th at 1403–04. Metropolitan obtained a CUP for a billboard. *Id.* Like the CUPs at issue here, it contained an expiration date and language requiring that the site be returned to its original condition upon expiration. *Id.* at 1403. The *Metropolitan* court found no fundamental vested right to continued use and maintenance of the billboard. *Id.* at 1404. Like Metropolitan, ATC "agreed to be bound by all [the CUP's] provisions," including ceasing use of the site upon expiration of the CUP. *Id.*

ATC does not have a fundamental vested right to continued use of the Border and Mission Valley sites, and as discussed above, substantial evidence in the record supports the City's decision. Accordingly, the City is entitled to summary judgment on ATC's fundamental vested rights claim.

## V.     Permit Streamlining Act

ATC and the City move for summary judgment on ATC's Permit Streamlining Act claim. ATC argues that the City violated the time limits of the Permit Streamlining Act and that ATC's CUP applications for the Border and Mission Valley sites must be approved as a matter of law. The City argues that: (1) the public notice required by law was not given; (2) ATC did not exhaust its administrative remedies on this claim; and (3) ATC is estopped from pursing this claim because ATC agreed to an extension.

Under California Government Code § 65950(a)(4), a public agency is required to "approve or disapprove the project . . . (4) Sixty days from the determination by the lead agency that the project is exempt from the California Environment Quality Act." In addition, "[i]n the event that a lead agency or a responsible agency fails to act to approve or to disapprove a development project within the time limits required by this article, the failure to act *shall be deemed approval* of the permit application for the development project." § 65956(b) (emphasis added). However, "the permit shall be deemed approved only if the public notice required by law has occurred." *Id.* The City does not dispute that it did not grant or deny ATC's CUPs for the Border and Mission Valley sites within sixty days after the project was found exempt from CEQA, leaving the Court to determine whether ATC's claim is precluded because: (1) the City's public notice was not sufficient; (2) ATC failed to exhaust

administrative remedies; or (3) the parties agreed to extend the time for approval or denial of the CUP applications to June 1, 2007.

### A. Public Notice

Section 65956(b) provides that if an agency fails "to approve or disapprove a development project within the time limits required by the article, the failure to act shall be deemed approval of the permit application for the development project. However, the permit shall be deemed approved only if the public notice required by law has occurred." The City argues that the public notice required by law was not given because the City's public notice did not state that the project would be approved without action within 60 days. The Court previously addressed and ruled on this legal issue when deciding three prior motions to dismiss and two motions for summary judgment in the consolidated cases.

As explained in the Court's prior decision, the statute itself does not define the "public notice required by law" when the notice is given by the public entity. The statute goes on to outline numerous requirements "[i]f the *applicant* chooses to provide public notice," including the requirement at issue here — inclusion of language in the notice that the project will be approved without action within 60 days. *Id.* (emphasis added).

The Court is presented with a divergence of authority on this point, with the City relying on a California Court of Appeals decision and ATC relying on a California Supreme Court opinion. The City argues that because the public notices do not contain "a statement that the project shall be deemed approved if the permitting agency has not acted within 60 days" the notices do not meet the statutory requirement for public notice. The City relies on *Mahon v. Cnty. of San Mateo*, 139 Cal. App. 4th 812, 821–22 (1st Dist. 2006). In *Mahon*, the California Court of Appeal analyzed this point in detail, and found that the requisite public notice must include a warning that the project would be deemed approved. *Id.* at 817–24. The *Mahon* Court acknowledged that the statute only required this warning when the public notice was given by the applicant, rather than by the public entity, but decided to impose it when public notice was given by the public entity as well. *Id.* at 821–22.

///

///

1    ATC argues that *Mahon* is irrelevant because it is contrary to the California Supreme Court's decision in *Bickel v. City of Piedmont*, 16 Cal. 4th 1040, 1046–47 (1997) *superceded by statute as recognized in Riverwatch v. Cnty. of San Diego*, 76 Cal. App. 4th 1428, 1439 (4th Dist. 1999). The *Bickel* Court found the following, in a footnote:

> Under section 65956, an applicant can compel an agency to give public notice of a development project or to hold a public hearing, or both, and the statute provides a means for the applicant to give public notice. (§ 65956, subds.(a), (b).) *Because in this case the city gave public notice and held public hearings, these statutory provisions are not in issue here.*

*Id.* at 1047 n.2. While certainly not as extensive as the *Mahon* decision, this language reflects that the means for an applicant to give notice do not apply when the public entity gives public notice, as the City did here, and holds public hearings, as the City did here. This language conflicts with *Mahon*, where the court found the County's notices insufficient because the notices did not comply with the requirements imposed on an *applicant* giving notice. The *Mahon* Court did not distinguish or cite *Bickel*.

When applying state law, a federal court must apply the decisions of a state's highest court "unless it has later given clear and persuasive indication that its pronouncement will be modified, limited, or restricted." *West v. American Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940). When the high court has not addressed an issue, a federal court must look to the state's appellate court decisions, "unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* at 237.

The state's highest court has addressed this issue in *Bickel,* and this Court must follow that decision. While *Bickel* was superceded by statute, the superceding statute did not address this point. In addition, even if the Court treated *Bickel* as dicta, it would still constitute persuasive data that the state's highest court would decide the issue differently than its appellate court did in *Mahon*. The *Mahon* decision, lacking any citation to or distinguishing of *Bickel*, is not sufficient to alter *Bickel*. ATC was not required to meet the applicant notice requirements, *i.e.*, that the project would be deemed approved if the agency failed to act within 60 days.

///

///

### B. Exhaustion of Administrative Remedies

The City argues that ATC cannot assert a PSA claim because it failed to exhaust its administrative remedies on this claim. ATC argues in opposition that there are no available means for administrative review for a violation of the PSA.

The Court agrees that an aggrieved party must "exhaust[] all *available means* of administrative review" before seeking judicial review. *Grant v. Superior Court*, 80 Cal. App. 3d 606, 609 (2d Dist. 1978) (emphasis added). However, the cases cited by the City are distinguishable because in each of those cases, administrative review was available pursuant to the relevant statute. *Abelleira v. Dist. Court of Appeal*, 17 Cal. 2d 280, 291 (1941) (Unemployment Insurance Act "contains a complete administrative procedure with provisions for one original determination and two appeals"); *Sierra Club v. City of Orange*, 163 Cal. App. 4th 523, 535–36 (4th Dist. 2008) (CEQA); *Mani Bros. Real Estate Grp. v. City of L.A.*, 153 Cal. App. 4th 1385, (2d Dist. 2007) (CEQA statutory scheme required aggrieved parties to object in writing or orally); *Coal. for Student Action v. City of Fullerton*, 153 Cal. App. 3d 1194, 1196–97 (4th Dist. 1984) (CEQA); *Leimert Co. v. Cal. Coastal Comm'n*, 149 Cal. App. 3d 222, 232 (5th Dist. 1983) (Public Resources Code provided for appeal to the California Coastal Commission); *Grant*, 80 Cal. App. 3d at 609 (Public Resources Code provided for appeal to state commission).

The doctrine of exhaustion of administrative remedies requires "that where an administrative remedy *is provided by statute*, relief must be sought from the administrative body and this remedy exhausted before the courts will act." *Abelleira*, 17 Cal. 2d at 292 (emphasis added). Additionally, "[t]here are exceptions to the exhaustion doctrine," including "when the administrative remedy is unavailable." *McAllister v. Cnty. of Monterey*, 147 Cal. App. 4th 253, 275 (6th Dist. 2007).

The City does not cite and the Court is not aware of any authority requiring exhaustion of an administrative remedy that does not exist. Notably absent from the City's brief is any case law requiring exhaustion of a PSA claim before the administrative body that failed to comply with the PSA. Additionally, the PSA does not contain any administrative remedies with regard to the deemed approved provision. The Court simply cannot dismiss a claim for failure to exhaust administrative remedies when there are not administrative remedies to exhaust.

### C.     Extension of Time

The City argues that ATC is estopped from asserting its PSA claim because ATC agreed to extend the time to approve or deny the application. But, § 65950(b) of the PSA only allows for one mutually agreed upon extension of the PSA deadline in writing that does not exceed 90 days. § 65950(b) ("This section does not preclude a project applicant and a public agency from mutually agreeing in writing to an extension of any time limit provided by this section pursuant to Section 65957."); § 65957 (allowing for only one extension "upon mutual written agreement" of the parties "for a period not to exceed 90 days from the date of the extension."). Section 65957 goes on to prohibit any other extensions, continuances, or waivers, and cautions that failure to comply with the time limits may result in the project being deemed approved.

Even if the Court assumes the extension to June 1, 2007 constituted a mutual agreement in writing to extend the PSA deadline, it would only extend the deadline 90 days, the maximum allowed by the statute, and the City's decisions came months after the deadline. Additionally, if the Court were to credit the extension to June 1, 2007, well beyond the 90-day limit imposed by the PSA, the City's decision still comes too late because the City did not act on the CUP applications until September 12, 2007, more than three months later. Likewise, the City's estoppel argument fails. The City asks that ATC be estopped from asserting this claim because it agreed to an extension, but as noted, even if the Court credited the full extension to June 1, 2007, ATC's PSA claim still succeeds because the City failed to act on its applications within 60 days of the extended deadline.

One of the purposes of the PSA is "to expedite decisions" on development projects. § 65921; *Bickel*, 16 Cal. 4th at 1047 (noting that the time limits imposed by § 65956 and the limited extension available under § 65957 are intended to expedite decisions on development projects). ATC's Border and Mission Valley CUP applications were not approved within the time limits prescribed by the PSA and accordingly must be deemed approved. ATC is entitled to summary judgment on its PSA claim.

### CONCLUSION

ATC's motion for summary judgment is **GRANTED in part and DENIED in part** as discussed above, and the City's motion for summary judgment is **GRANTED in part and DENIED in part** as discussed above.

1       Additionally, the Court **GRANTS** the parties' joint motions to exceed the page limits (Dkt. Nos. 233, 269), ATC and the City's motions to seal certain documents identified as confidential pursuant to the protective order (Dkt. Nos. 237, 262, 272, 279), and ATC's request for an extension of time to file its separate statement of undisputed facts (Dkt. No. 261).

**IT IS SO ORDERED.**

DATED: August 26, 2011

_____
Hon. Roger T. Benitez
United States District Judge